# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT K. RICKS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>A. AUSTRIA,<br><br>　　　　Defendant. | Case No.: 1:15-cv-01147-AWI-BAM (PC)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO MODIFY THE SCHEDULING ORDER (ECF No. 41)**<br><br>**FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 43) BE GRANTED, AND RECOMMENDING THE PARTIES' MOTIONS TO CONSOLIDATE (ECF Nos. 42, 50) BE DENIED**<br><br>**FOURTEEN (14) DAY DEADLINE** |

Plaintiff Scott K. Ricks is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This action is related to *Ricks v. Onyeye, et al.*, 1:15-cv-1148-AWI-BAM, and *Ricks v. Levine, et al.*, 1:15-cv-1150-AWI-BAM.

**I.　Background**

This case proceeds on Plaintiff's complaint against Defendant Dr. A. Austria for deliberate indifference to Plaintiff's serious medical need in violation of the Eighth Amendment. (ECF No. 1.) As discussed in more detail below, Plaintiff's claim concerns allegations that in 2014, Defendant refused to perform any diagnostic tests or to refer Plaintiff to a surgeon despite confirming that Plaintiff had three ruptured, ventral hernias, severe pain, and other issues. (*Id.*)

1

Following Defendant's answer to the complaint, (ECF No. 28), on June 29, 2016, the Court issued a discovery and scheduling order in this matter, (ECF No. 30). The deadline set for filing all dispositive motions, other than a motion for summary judgment for the failure to exhaust available administrative remedies, was May 8, 2017. (ECF No. 30 at 3.)

On May 8, 2017, Defendant filed a motion to modify the discovery and scheduling order. Defendant sought to gather evidence related to recent medical treatments that Plaintiff had undergone, and to extend the dispositive motion deadline so that Defendant could file a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 41.) Plaintiff did not file any response to this motion.[1]

On May 24, 2017, Defendant filed a motion to consolidate this action with the two related actions noted above. (ECF No. 42.) Plaintiff did not file any response to that motion; however, on January 2, 2018, Plaintiff also filed a motion seeking to consolidate this action with the two related actions noted above. (ECF No. 50.)

On October 30, 2017, Defendant filed a motion for summary judgment under Federal Rule of Civil Procedure 56, on the grounds that the undisputed facts show that Defendant was not deliberately indifferent to Plaintiff's serious medical need in violation of the Eighth Amendment. (ECF No. 43.) On November 27, 2017, Plaintiff filed an opposition to the motion for summary judgment. (ECF No. 46.)[2]

---

[1] Defendant explained in the motion that Plaintiff's deposition revealed he had a third hernia surgery on February 27, 2017, and thus discovery needed to be re-opened to allow for gathering evidence related to that surgery. Further, Defendant needed additional time to prepare the motion for summary judgment taking into account the surgery.

Defendant has now submitted the evidence in support of the instant motion for summary judgment, it having apparently been produced in one of the related actions. Thus, the request to re-open discovery is rendered moot, although the Court finds that the discovery should be allowed to be used in this related case for purposes of judicial economy and in the interests of justice. Furthermore, the Court finds good cause to grant Defendant's request to extend the deadline to submit a motion for summary judgment, in order to deem the instant motion to be timely filed.

[2] Plaintiff's opposition was submitted with a proof of service indicating that the opposition was provided to prison officials for mailing on November 19, 2017, and it was therefore timely filed. (ECF No. 46 at 41.) *See Douglas v. Noelle*, 567 F.3d 1103, 1106-07 (9th Cir. 2009) (under prison mailbox rule, documents are deemed filed at the time that they are delivered to the prison authorities for forwarding to the court clerk).

On December 4, 2017, Defendant then sought an extension of time to file a reply to Plaintiff's opposition to the motion for summary judgment, (ECF No. 47), which was granted, (ECF No. 48). On January 18, 2018, Defendant timely filed a reply. (ECF No. 51.)

The above motions are deemed submitted, without oral argument. Local Rule 230(l).

## II. Motion for Summary Judgment

### A. Legal Standards

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id*.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id*. (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id*.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not

suffice in this regard. *Id.*; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### B. Summary of Complaint Allegations

Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at Salinas Valley State Prison. The events at issue occurred while Plaintiff was incarcerated at North Kern State Prison.

Plaintiff alleges that prior to his transfer to North Kern State Prison, he underwent two hernia surgeries, which were "failed and botched." (Compl., ECF No. 1, at 4.) Plaintiff was left with three ruptured ventral hernias when he was transferred to North Kern State Prison, on December 19, 2013.

4

On December 20, 2013, Plaintiff submitted a sick call slip, stating that he was in extreme pain and suffering, and requesting surgery for his hernias. On December 23, 2013, Plaintiff was seen by Nurse Practitioner ("NP") Chernekoff. NP Chernekoff refused Plaintiff's request to see a surgeon, telling Plaintiff that North Kern State Prison was a reception center, and that only emergency surgeries were authorized. Plaintiff told NP Chernekoff that he was in extreme pain. NP Chernekoff was "ambivalent" to Plaintiff's pain and suffering. (*Id.* at 6.)

On January 10, 2014, Plaintiff was seen by his assigned primary care physician, Defendant Dr. A. Austria. Defendant Austria examined Plaintiff and verified that Plaintiff had three ruptured, ventral hernias. Despite the fact that his abdomen "looks like there is a volleyball sticking out, under the skin, on the left side of my abdomen, and it looks like there are two (2) softballs sticking out, under the skin, on my right side," Defendant Austria refused any diagnostic tests or a referral for surgery. (*Id.* at 6-7.)

Plaintiff was seen again by Defendant Austria on February 18, 2014. Defendant Austria refused to examine Plaintiff or refer him to a surgeon.

Plaintiff filed another medical request on March 1, 2014. Plaintiff was seen by Defendant Austria on April 1, 2014. Defendant Austria again refused to examine Plaintiff or refer him to a surgeon, despite Plaintiff's complaint of severe pain. Defendant Austria similarly refused to examine Plaintiff or refer him to surgery on April 29, 2014.

On May 26, 2014, Plaintiff wrote to J. Clark Kelso regarding the lack of treatment for his hernias. On May 29, 2014, Plaintiff was transferred to Pleasant Valley State Prison.

On July 26, 2014, Plaintiff was seen and examined by a surgeon, Dr. Monfore, who determined that Plaintiff needed urgent surgery. Dr. Monfore recommended "major repair" and opined that "they (CDCR) really f***ed you up, didn't they?" (*Id.* at 9.)

Plaintiff was seen by another surgeon, Dr. M. Michael, at San Joaquin Community Hospital on September 23, 2014. Dr. Michael determined that Plaintiff needed surgery immediately, but would have to be referred to U.S.C. Medical Center in Los Angeles for a "component separation repair." (*Id.* p. 10.)

///

### C. Undisputed Material Facts[3]

Plaintiff is a currently-incarcerated state inmate. (Pl.'s Dep. 8:24-9:16.) Plaintiff has no formal education in the medical or mental health fields. (Pl.'s Dep. 10:5-21.) Plaintiff has never worked in the medical or mental health field. (Pl.'s Dep. 10:22-11:1.)

#### 1. Sierra Conservation Center

Plaintiff was housed at Sierra Conservation Center from February 25, 2009, until he was paroled on February 27, 2012. (Feinberg Decl. ¶ 7, Ex B.) Dr. Forster was Plaintiff's primary care physician at Sierra Conservation Center, beginning around August 28, 2009. (Forster Decl. ¶ 5.)

On May 6, 2010, Plaintiff underwent hernia repair surgery performed by Dr. Levine at Mark Twain St. Joseph's Hospital. (Feinberg Decl. ¶ 9, Ex H; Forster Decl. ¶¶ 6-11.) On January 18, 2011, Dr. Forster saw Plaintiff for the recurrence of the hernia. (Feinberg Decl. ¶ 10, Ex I; Forster Decl. ¶¶ 12-15.)

On April 21, 2011, Dr. Levine performed a second surgical hernia repair on Plaintiff. (Feinberg Decl. ¶ 10, Ex J; Forster Decl. ¶ 16.) Plaintiff claims that the hernia recurred a second time on or about August 2011. (Pl's Dep. 63:5-9; 63:5-14.)[4]

Plaintiff refused to see Dr. Forster in August 2011. On August 4, 2011, Plaintiff refused a scheduled follow-up appointment to see Dr. Forster regarding his hernia. Plaintiff wrote on the refusal form, "I just saw Dr. Forster 3 weeks ago. I don't need to see him again. This is an unnecessary appointment. Thank you." (Forster Decl. ¶ 21, Ex E.)

///
///
///
///

---

[3] *See* Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment, (ECF No. 43-3), and Plaintiff's Response to Defendants' Statement of Undisputed Facts In Support of Motion for Summary Judgment and Opposition to Granting Summary Judgment, (ECF No. 46).

[4] The parties dispute whether the hernia in fact recurred at this time, but agree for the purposes of this motion that Plaintiff asserts that the hernia recurred at some point on or about August 2011.

On August 19, 2011, Plaintiff refused a regularly scheduled appointment to see Dr. Forster. He wrote on his refusal form, "I am refusing the Dr. Forster appointment for 8-19-2011. I did NOT request this appointment; Dr. Forster did NOT request this appointment. I just saw him on 6-6-2011, and I will see him again in September for my chronic care update. Do not re-ducat me until then." (Forster Decl. ¶ 22, Ex F.)

On September 22, 2011, Dr. Forster met with Plaintiff for a regularly scheduled appointment regarding his chronic medical conditions. Plaintiff did not have any complaints regarding his hernia, and Plaintiff had healed from his hernia surgery earlier in the year. (Forster Decl.¶ 23.)

On February 6, 2012, Plaintiff refused to submit to blood tests for scheduled lab tests. On the refusal form regarding this treatment, Plaintiff wrote, "I refuse to give blood on 2-6-2012. I refuse this and any/all future lab ducats. I go home in 3 weeks – thanks anyway." Later, on February 13 and 14, 2012, Plaintiff refused several prescribed medications. (Forster Decl.¶ 24, Ex H.)

On February 23, 2012, Plaintiff refused to attend his final scheduled appointment with Dr. Forster before being paroled. Plaintiff wrote on the refusal form, "I am being released in 3 days, and I do not need to be seen by Dr. Forster or any other medical staff. I did not request to be seen by Dr. Forster. He can renew my parole meds without me! Thank you." (Forster Decl.¶ 25, Ex. I.)

### 2. Parole and Re-Incarceration at North Kern State Prison

For nearly a year-and-a-half, from February 27, 2012 to June 2013, Plaintiff was out on parole. (Pl.'s Dep. 14:17:1; 71:13-17.) In June 2013, Plaintiff re-offended while on parole and was re-incarcerated. (Pl.'s Dep. 71:13-17.) After Plaintiff was re-incarcerated, he was housed at North Kern State Prison from December 19, 2013, to May 29, 2014. (Feinberg Decl. ¶ 13, Ex B.)

Plaintiff had an intake examination at North Kern State Prison on December 23, 2013, conducted by Nurse Practitioner ("NP") Chernekoff. NP Chernekoff noted in the examination report that Plaintiff's hernias had recurred . (Feinberg Decl. ¶ 14, Ex. Q.) NP Chernekoff also noted a lack of abdominal pains/crams, bowel sounds present in all four quadrants, and therefore

7

that Plaintiff's hernias were not incarcerated, and thus, his hernias were not an acute or emergency condition. (Feinberg Decl. ¶ 14, Ex. Q; Austria Decl. ¶¶ 3, 12.)

While at North Kern State Prison, Plaintiff saw Defendant Austria on January 10, 2014, February 18, 2014, April 1, 2014 and April 29, 2014. (Feinberg Decl. ¶¶ 15-20, Ex. Q; Pl.'s Dep. 72:14-25; Austria Decl. ¶ 2.) On those dates, Defendant Austria saw Plaintiff for treatment of seizures, his lower back condition, and about the renewal of his anti-diarrhea medication. (Feinberg Decl. ¶¶ 15-20; Pl's Dep. 74:10-75:6; 76:1-7; Austria Decl. ¶ 2.)

Specifically, Plaintiff first saw Defendant on January 10, 2014. Defendant noted that Plaintiff's chief complaint was "seizures," and he complained of a seizure a month prior. (1/10/14 Progress Note, ECF No. 43-5, at 52.) Defendant noted that Plaintiff's anti-seizure medication Dilantin was under the therapeutic standard, and increased Plaintiff's Dilantin. (*Id*.) Defendant also noted: "Ventral hernia stable, non-tender." (*Id*.)

On February 18, 2014, Plaintiff submitted a Health Care Services Request Form stating that he had a seizure that morning, and it was his third seizure in thirty-five days. (2/18/14 Health Care Services Request Form, *id*. at 54.) Plaintiff also wrote that he wanted to see his primary care physician to increase his seizure medication. (*Id*.) Defendant saw Plaintiff that same day, and Defendant noted again that Plaintiff's chief complaint was seizures. (2/18/14 Progress Note, *id*. at 56.) Plaintiff also complained of lower back pain. (*Id*.) Defendant noted that Plaintiff's ventral hernia was "stable." (*Id.*) Defendant ordered x-rays of Plaintiff's lower back, and ordered blood work to check Plaintiff's levels of Dilantin. (*Id*.)

Plaintiff's blood was drawn that same day, and the blood test showed that Plaintiff's Dilantin level was lower than therapeutic levels. (2/18/14 Report, *id*. at 58.) Dr. Austria ordered that Plaintiff's Dilantin prescription be increased, and for Plaintiff's levels to be re-checked in two weeks. (*Id*.) The next month, a follow-up blood test on March 5, 2014, showed that Plaintiff's Dilantin levels were within proper limits. (3/5/14 Report, *id* at 60.)

Plaintiff's x-rays were done on February 18, 2014, and showed that Plaintiff had mild degenerative changes at L4 and L5. (Lumbar Spine X-ray, *id*. at 62.) Finding that this is not uncommon to see in an obese, forty-seven-year-old man, and was not an acute condition that

8

required urgent treatment, Defendant continued Plaintiff's pain medication for Plaintiff's lower back pain. (Austria Decl., ECF No. 43-4, ¶ 8.)

On April 1, 2014, Defendant saw Plaintiff for an auto-refill for Loperamide, an anti-diarrheal. (4/1/14 Progress Note, ECF No. 43-5, at 64.) Plaintiff claimed that his anti-depression medication, Sertraline (Zoloft) gave him diarrhea. (*Id*.) Lopermide cannot be auto-refilled, and must instead be reviewed by a physician upon each refill, so Defendant found that a Lopermide prescription should be monitored and an auto-refill was not in Plaintiff's best interest. (Austria Decl. ¶ 9.) . Defendant also noted in his progress notes that Plaintiff's "[v]entral hernia [was] stable [and to] continue with activity precaution." (4/1/14 Progress Note.)

Defendant saw Plaintiff for the last time on April 29, 2014, for a medication evaluation. (4/29/14 Progress Note, *id*. at 66.) Plaintiff again requested an auto-refill for Loperamide, which was again denied. (*Id*.) Defendant wrote that he told Plaintiff to notify the Licensed Vocational Nurse three days before he runs out, and that Plaintiff agreed with this plan. Defendant also noted that Plaintiff "has no other issues at this time" and "[v]entral hernia stable continue activity precaution." (*Id*.)

According to the opinions of Dr. B. Feinberg, Chief Medical Consultant for the California Correctional Health Care Services, and Defendant Austria, it was not medically necessary that Plaintiff have a third corrective hernia surgery in the four months between January and April 2014. (Feinberg Decl. ¶ 30(d), (e); Austria Decl. ¶ 12.). When Defendant Austria saw Plaintiff between January and April, 2014, he did not believe that Plaintiff was a candidate for a third hernia surgery because the risks of complications and recurrence outweighed the benefits. (Feinberg Decl. ¶ 30; Austria Decl. ¶ 13.) Further, the issue of Plaintiff's seizure control medication had to be resolved before a third corrective hernia surgery could be considered. (Feinberg Decl. ¶ 30(n); Austria Decl. ¶ 13.)

**3. Pleasant Valley State Prison**

On May 29, 2014, Plaintiff left North Kern State Prison and was housed at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl's Dep. 75:7-11.) Dr. Onyeje was the Chief Medical Officer at Pleasant Valley State Prison. (Feinberg Decl. ¶ 21; Pl.'s Dep. 78:23-79:2.) Typically,

the Chief Medical Executive does not personally examine and treat inmate patients, but oversees the inmate's care that other physicians directly provide. (Feinberg Decl. ¶ 21.)

On July 28, 2014, Dr. Onyeje approved Dr. La Sierra's request for a hernia repair surgical consultation. (Feinberg Decl. ¶ 22, Ex. Z.) On September 23, 2014, Dr. Michael (an outside surgeon associated with San Joaquin Community Hospital and Mercy Hospital, Bakersfield) examined Plaintiff. Dr. Michael's report states that Plaintiff needed component separation repair and suggested that Plaintiff be sent to USC's tertiary care center. (Feinberg Decl. ¶ 22, Ex. AA.) A tertiary care center involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art facilities. (Feinberg Decl. ¶ 22; Pl.'s Dep. 21:1-2.)

On October 28, 2014, Dr. Onyeje spoke to Dr. Michael regarding Plaintiff's hernias. Dr. Michael told Dr. Onyeje that because of the large size of the hernia, the likelihood of incarceration (or strangulation) of the hernia was very low. Dr. Michael warned that surgical repair, or herniorrhaphy, in Plaintiff's case was dangerous: "associated with both high morbidity and high mortality risks." (Feinberg Decl. 24, Ex. CC.) Dr. Michael further agreed that a conservative approach, by use of an abdominal binder, would be the safest treatment at that time, and if surgical repair is required, it should be performed at a tertiary surgical center. (*Id*.)

On October 2, 2014, Dr. Chokatos, a board certified doctor of internal medicine, saw Plaintiff. Dr. Chokatos wrote in his medical progress notes for the visit that Plaintiff's "abdominal wall looked very thin and the organs could be felt right through the skin without any difficulty. There was little abdominal muscle that could be felt." (Feinberg Decl. ¶ 23, Ex. BB.) Dr. Chokatos opined that due to Plaintiff's lack of abdominal muscle, surgery was not likely to succeed. Dr. Chokatos recommended conservative treatment, *i.e*., an abdominal binder and discussed the case with Dr. Onyeje. (Feinberg Decl. ¶ 23, Ex. BB.) Specifically, Dr. Chokatos' report stated: "The case was discussed with the Chief Medical Officer Onyeje. A general surgeon had seen him locally, but says that closure could not be performed in their facility as the hernias are too large and the anatomy is difficult. For that reason, the patient wants to be referred to a Tertiary Care Center. Unfortunately, the huge hernia would require developed abdominal wall

tissue to effect closure. This is not the case; his musculature is essentially atrophic. He has already failed mesh closure. The best option is an abdominal binder." (Feinberg Decl. ¶ 23, Ex. BB.)

On June 3, 2015, Dr. Onyeje again considered surgical hernia repair at the request of Dr. Conanan. Dr. Onyeje referred the issue to the Medical Authorization Review (MAR) Committee. (Feinberg Decl. ¶ 25, Ex. DD.) The MAR Committee consists of representatives from the health care staff of each institution and no less than three staff physicians. (Feinberg Decl. ¶ 25, Ex. DD.) On June 9, 2015, the MAR Committee held that the risk of surgery outweighed the benefits, and recommended conservative treatment. (Feinberg Decl. ¶ 25, Ex. DD.)

### 4. Salinas Valley State Prison

On February 1, 2016, Plaintiff was transferred from Pleasant Valley State Prison to Salinas Valley State Prison. (Feinberg Decl. ¶ 26, Ex. B at 1.) While at Salinas Valley State Prison, Plaintiff's case was referred to medical staff at San Joaquin General Hospital and Twin Cities Community Hospital for consultation regarding the possibility of a surgical repair for his recurrent hernia. These hospitals refused to perform the procedure. (Feinberg Decl. ¶ 26; Pl.'s Dep. 18:8-24; 21:9-23:13; 26:3-11; 27:18-28:12.)

Plaintiff had a third hernia corrective surgery on February 27, 2017, at Stanford University Medical Center ("Stanford"). (Feinberg Decl. ¶ 27; Pl.'s Dep. 17: 20-24; 21:1-4.) Stanford is a tertiary care center and one of the best hospitals in the United States with very high quality medical care. (Feinberg Decl. ¶¶ 22, 26; Pl.'s Dep. 17:24-18:7.)

Dr. Spain, a surgeon at Stanford, first saw Plaintiff on November 1, 2016, and told Plaintiff he would do the surgery. (Feinberg Decl. ¶ 27; Pl.'s Dep. 26:16-25.) Dr. Spain gave Plaintiff the option of not having the surgery at all and simply living with the condition as it was. (Feinberg Decl. ¶ 28; Pl.'s Dep. 30:5-12.) Dr. Spain warned Plaintiff that risks of surgery included bowel injury and other complications. (Feinberg Decl. ¶ 27.) Dr. Spain warned Plaintiff that one of the risks of surgery was death. (Pl's Dep. 37:1-9.) Dr. Spain warned Plaintiff that one of the risks of surgery was recurrence of the hernias. (Feinberg Decl. ¶ 28; Pl's Dep. 38:10-21.) Specifically, Dr. Spain's notes place the risk of complication at 20%, a significant percentage,

with a 5% chance of serious complications and a 20% chance of recurrence. (Feinberg Decl. Ex. EE.)

At the time of the third corrective surgery, Plaintiff was forty-nine years old, obese, and in poor physical condition. Plaintiff's age and physical condition greatly increased the risks of surgery and the possibility of a third recurrence. (Feinberg Decl. ¶ 30(b).) Plaintiff's seizure disorder substantially increased the risks of surgery. (Feinberg Decl. ¶ 30(c).)

A few days after surgery, while Plaintiff was still at Stanford, he "coded" in the middle of the night and went into a coma which lasted a week. (Pl.'s Dep. 37:8-14.) The Stanford records indicate that Plaintiff suffered acute postoperative respiratory insufficiency, pleural effusion and acute pulmonary embolism, which is often fatal. (Feinberg Decl. ¶ 29.) Further, while Plaintiff was recovering from surgery at Stanford, he contracted an infection at the surgery site and had a 102.9-degree temperature. (Feinberg Decl. ¶ 29; Pl.'s Dep. 37:18-24.)

**D.     Discussion**

As noted above, this case concerns Plaintiff's claim that Defendant Austria was deliberately indifferent to his condition in 2014. Specifically, Plaintiff testified in his deposition that Defendant was deliberately indifferent by not referring Plaintiff for a third corrective hernia surgery in the four months between January and April 2014. (Pl.'s Dep. 75:12-25.) Defendant argues that summary judgment should be granted in his favor because the undisputed facts show that he was not deliberately indifferent to Plaintiff's condition, and because the decision to forgo the third corrective surgery was a medically acceptable option.

While the Eighth Amendment entitles plaintiff to medical care, it is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439

12

F.3d at 1096); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." *Wilhelm*, 680 F.3d at 1122 (citing *Jett*, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. *Snow*, 681 F.3d at 985 (citation and quotation marks omitted); *Wilhelm*, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Wilhelm*, 680 F.3d at 1122-23 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citing *Jackson*, 90 F.3d at 332) (internal quotation marks omitted). In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. *Id*. Deliberate indifference may also be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." *Hallet v. Morgan*, 296 F.3d 732, 734 (9th Cir. 2002).

In this case, there is insufficient evidence for a reasonable finder of fact to determine that Defendant was deliberately indifferent to a serious medical need of Plaintiff's when he treated him from January 2014 through April 2014. Plaintiff's claim in his case is that Defendant was deliberately indifferent when he failed to recommend him for a third hernia repair surgery. The parties do not dispute that by the time Defendant began treating Plaintiff in January 2014, his hernias had recurred. A reasonable jury might conclude that Plaintiff's ventral hernia was a serious medical need. However, the medical records from this period show that Plaintiff's ventral hernias were repeatedly found to be stable or non-acute, and he was treated for his other, primary complaints, including repeated seizures, back pain, and diarrhea.

1   Plaintiff asserts that, contrary to the records, including his own requests for medical care from the time, that he was in extreme pain, and that he requested the surgery, but his request was denied for no valid reason. (ECF No. 46, at 7-10.) Plaintiff's medical records do not show any complaints or other objective medical evidence of severe pain, nor do they support any finding that despite his hernias not being incarcerated, he nevertheless medically required surgery. Plaintiff offers no evidence in support of this assertion other than his own unqualified opinion. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). In fact, Plaintiff agrees that his hernias were not incarcerated at this time, and that Dr. Austria saw him for his "numerous seizures," lower back condition, and his anti-diarrhea medication. (ECF No. 46, at ¶¶ 24, 26, 27.)

In contrast, Defendant relies on his own medical opinion and the opinion of Dr. B. Feinberg, who reviewed Plaintiff's medical records and submitted a declaration regarding his medical opinion. (Feinberg Decl., ECF No. 43-5.) Defendant notes that the report from Plaintiff's intake examination discussed the ventral hernias, but noted no pain or cramps, and noted bowel sounds present in all four quadrants, which showed that the hernias were not incarcerated, and thus were not an acute or urgent condition.[5] Defendant found this to be consistent with his own observations, education, and experience, including his understanding that typically, large hernias like Plaintiff's do not cause pain, but rather only cause minor discomfort from having bulges. (*Id.* at ¶ 12.) Defendant further found that a third hernia surgery was not medically necessary because the risks of not having the surgery were low, since the size of the hernias would not cause construction or strangulation. (*Id.*) Further, the risks of complication and recurrence outweighed the benefits due to Plaintiff's condition and medical history, including his weak abdomen muscles, obesity, and lack of exercise, and the issue of Plaintiff's seizure control

---

[5] Plaintiff disputes that he informed Nurse Chernekoff during his intake examination that he was in pain, but even if true, the report does not reflect any such notation, and thus Defendant could not have been aware of any such complaint from the report.

14

was far more important and would have to be resolved before surgery could be considered. (*Id.* at ¶ 13.)

Dr. Feinberg's opinion agrees with Defendant's opinion. (Feinberg Decl. ¶ 30.) Specifically, he finds that Plaintiff was under Defendant's care for a brief time, that his seizures had to be controlled before any hernia reparative surgery could be considered, and, finally, that the hernia was not in an acute condition that had to be urgently addressed. (*Id.* at ¶ 30.n.)

As noted above, Plaintiff does not dispute his poor physical condition and that he suffered numerous seizures at the time. (ECF No. 46 ¶¶ 27, 33, 60.) He only asserts, without any support, that he does not believe these issues had anything to do with his need for surgery or the risks of surgery. Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). Plaintiff's belief that he required the surgery, when his medical care professionals did not, shows a mere difference of opinion between a prisoner and prison medical staff, not deliberate indifference. *See Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

Plaintiff also relies on the fact that a third hernia surgery was ultimately performed by Dr. Spain as evidence of Defendant's deliberate indifference in this case, when contrasted with Defendant's determination not to recommend the surgery. As noted above, to show deliberate indifference, Plaintiff must show that the course of treatment chosen was "medically unacceptable under the circumstances" and chosen "in conscious disregard of an excessive risk to the plaintiff's health." *Jackson*, 90 F.3d at 332. "Society does not expect that prisoners will have unqualified access to health care[.]" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, an inmate does not have the same unrestricted choice in receiving medical treatment as he would if he were not incarcerated.

Here, it is undisputed that even in 2016, when Plaintiff was referred to outside hospitals for consultation regarding the potential surgery, those hospitals refused to do the procedure. Instead, in Plaintiff's own words, they "referred me to what's called a tertiary care center or a specialty or specialist because they were not experienced enough to perform the extensive

surgery that I required." (Pl.'s Dep. 20:13-16.) It is further undisputed that the tertiary care center which performed Plaintiff's surgery involves advanced and complex procedures and treatments, performed by medical specialists in state-of-the-art facilities. Thus, the option for surgery in this case was limited to highest level of care available in the medical profession. Yet even at that level of expertise and care, Plaintiff's notes show that he was advised one of his options was to do nothing, and that the likelihood of the risks of complication from the surgery was 20%, with a 5% chance of serious complications and a 20% chance of recurrence.

Plaintiff gives the unsupported opinion that these medical risks were "fairly minor," (ECF No. 46 at ¶ 56.) This is not sufficient to dispute that this was Dr. Spain's estimate of the risks to him despite being treated at one of the best hospitals in the United States. Further, Defendant has submitted the opinion of himself and Dr. Feinberg that these were significant risks, and that they outweighed the benefits of surgery. (Feinberg Decl. ¶ 30. j, k.) At most, Plaintiff may have shown a difference in medical opinions regarding the risks of surgery between these doctors, which is not sufficient to show that Defendant acted with deliberate indifference. *See Toguchi*, 391 F.3d 1057-58. Nor does Plaintiff dispute that even Dr. Spain considered the option of doing nothing to be a medical acceptable alternative to having the surgery, or that even with the best care in the country, Plaintiff in fact suffered complications and nearly died.

In evaluating whether a medical provider's choice of care was medically acceptable, the inquiry is focused on whether the services are "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 208 (D. Puerto Rico 1998) (quoting *U.S. v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987)). "The standard does not include the 'most sophisticated that money can buy' . . . but only that which is reasonably appropriate, 'within modern and prudent professional standards' in the field of medicine and health." *Id*. In this case, the undisputed evidence shows that the surgical option for Plaintiff's hernia condition was more than what was reasonably appropriate, and therefore Defendant's failure to recommend that surgery under the circumstances was not deliberate indifference.

///

For these reasons, the Court finds that there is insufficient evidence for a reasonable finder of fact to determine that Defendant was deliberately indifferent to a serious medical need in this case. Therefore, summary judgment should be granted in Defendant's favor.

Defendant also asserts that the Court should grant summary judgment to Defendant on the basis of qualified immunity. However, the Court finds that this argument need not be reached, based upon the above determination regarding the undisputed facts in this case.

### III. Motions to Consolidate

As noted above, the parties have filed motions to consolidate this action with the two related cases. Defendant asserts in support that there are common issues of law and fact in all three cases, and consolidation would avoid unnecessary duplication of proceedings and efforts, and guard against the risk of inconsistent adjudications.

Federal Rule of Civil Procedure 42(a) provides that: "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). Whether or not to allow consolidation is in the Court's sound discretion. *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir.1996).

At this time, the Court does not find it appropriate to consolidate these actions. Although there are some commonalities among the actions, the claims involve medical determinations made by different professionals while Plaintiff was housed at different institutions, involving different judgments and information, and occurring over a course of several years. Defendant asserts that this case may involve three trials with the same witnesses and evidence, but the Court may reconsider whether consolidation is appropriate if and when these matters reach trial. Therefore, the Court will recommend that the parties' motions to consolidate be denied, without prejudice.

### IV. Conclusion and Recommendations

Accordingly, it is HEREBY ORDERED that Defendant's motion to modify the scheduling order (ECF No. 41), is granted, to the extent explained above.

///

17

Further, for the reasons explained above, IT IS HEREBY RECOMMENDED that

1. Defendant's motion for summary judgment (ECF No. 43), be granted; and
2. The parties' motions to consolidate this case with the related cases (ECF Nos. 42, 50), be denied.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **February 14, 2018** /s/ *Barbara A. McAuliffe*
UNITED STATES MAGISTRATE JUDGE